UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDMOND ZOICA,

        Petitioner,

                                  CASE NO. 12-14923
v.                              HONORABLE DENISE PAGE HOOD

CINDI CURTIN,

        Respondent.
_____/

**OPINION AND ORDER
DENYING THE PETITION FOR WRIT OF HABEAS CORPUS,
DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, BUT
GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Petitioner Edmond Zoica has filed a *pro se* application for the writ of habeas corpus under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's state conviction for conspiracy to commit first-degree murder. Petitioner raises several issues regarding his trial and appellate attorneys. Respondent Cindi Curtin urges the Court through counsel to deny the petition. The Court agrees that Petitioner's claims do not warrant habeas corpus relief. Accordingly, the habeas petition will be denied.

## I. INTRODUCTION

### A. The Charge and Trial Testimony

In 2005, Petitioner was charged in Oakland County, Michigan with conspiracy to commit first-degree (premeditated) murder. *See* Mich. Comp. Laws § 750.316(1)(a); Mich. Comp. Laws § 750.157a. He and his two co-defendants, Oliger Merko (Merko) and Ketjol Manoku (Manoku), were tried jointly, but before separate juries, in Oakland

County Circuit Court. The Michigan Court of Appeals provided the following overview of

the evidence at trial:

> The incident giving rise to defendant's convictions is apparently the culmination of a rivalry between two groups of Albanian men that resulted in codefendant Ketjol Manoku opening fire at a minivan holding five members of the rival group after the minivan drove into a parking lot in the late night hours of July 17, 2004, where defendant and his codefendants were standing. Four of the minivan passengers were stuck by bullets, one fatally, as the minivan was attempting to leave the parking lot.

*People v. Zoica*, No. 270881, 2008 WL 747099, at *1 (Mich. Ct. App. Mar. 20, 2008)

(unpublished). The Court of Appeals provided the following additional details about the

evidence at trial:

> [D]efendant and his coconspirators met together on July 15, 2004, near a coffee shop in Royal Oak where members of the rival group were patronizing, for the purpose of shooting Markiol Jaku and Martin Vucaj, members of that rival group. Defendant did not want the shooting to occur, but only because the shop was too crowded with people. Instead, later that night or the next evening, defendant and his coconspirators proceeded to watch the coffee shop the rival group members were fixing up to open which was called Goodfellows. Defendant and his coconspirators were dressed in dark clothing and were in vehicles with tinted windows. When one of the members of the rival group left the shop, defendant and some of his friends followed in their vehicle. Defendant rolled his window down and had a handgun but did not shoot at the rival group member possibly because of heavy traffic or because they could not tail him close enough to get off a shot.
>
> The day before the shooting, July 16, 2004, defendant and his coconspirators met at a coney island to discuss shooting members of the rival group at Goodfellows. Later that day, they also met at Manoku's apartment to discuss the shooting. They developed a plan to return to Goodfellows and "shoot up the people," meaning shoot members of the rival group. Defendant suggested that the shooter – Manoku – be on the back of a motorcycle just like he had seen in an action movie and defendant would follow behind to conceal the motorcycle, which was covered in blue painters tape. The shooting would occur the next night, July 17, 2004, the night before coconspirator Oliger Merko's wedding.

2

The next day – the day of the planned shooting – one of the coconspirators, Florjon Carcani, expressed reservations about going through with the shooting. Defendant became angry and said "You're going to go along with this." Preparing for the shooting, defendant and his coconspirators retrieved weapons, including an AK-47 assault rifle that defendant had purchased a couple months before. The assault rifle was placed in Merko's vehicle, the vehicle in which defendant was riding. After the motorcycle was in position for the shooting, the plan was changed and defendant and his coconspirators went to an apartment complex. While in the parking lot, where defendant and his coconspirators were standing by their vehicle that held the AK-47, a minivan carrying rival group members pulled into the parking lot. Shortly thereafter, Manoku, pulled his nine millimeter handgun and opened fire, shooting four of the five people in the minivan as it was attempting to leave. After disposing of evidence and agreeing to an alibi, defendant and his coconspirators went to defendant's apartment and pretended to be having a party. During the police investigation of the shooting, defendant kept in close contact with Carcani, telling him to "keep the alibi and nothing's going to happen to you."

*Id.* at *2.

Petitioner did not testify or present any witnesses. His co-defendants presented four witnesses: Romeo Toro, Police Officer Brian Honsowetz, Cynthia Bieri, and Police Officer James Kant. Mr. Toro testified that he was the owner of the Goodfellows coffee shop and that he and the other victims of the shooting were at Goodfellows on the night of the shooting. He explained that the group left Goodfellows in his mother's mini van that night and went to an apartment complex in Clawson to visit some girls. Toro stated that there were no weapons in the van and although there was a metal pipe in the van, he did not know how long it had been there.

Continuing, Toro stated that he owned a small black sports utility vehicle at the time, but that it was probably at home on the night of July 17, 2004. He admitted that, after the shooting at the apartment complex, he did not mention Manoku's name to the police even though he knew Manoku had fired shots into the mini van where he and his

friends were seated.  Toro also admitted that he lied to the police after the shooting, but he explained that he had been shocked, afraid, and fearful of retaliation from the defendants at the time.  He denied telling the defendants or their friends that his group was going to the apartment complex, and he claimed that he did not expect to see the defendants or any of their friends at the apartment complex.  He also claimed that he did not see Petitioner at the complex immediately before the shooting, but he did say that two men besides Manoku and Merko were present at the shooting and that he had been unable to see their faces.    Officer Honsowetz testified that he was dispatched to the hospital where the victims went after the shooting.  He spoke to two of the five victims and got a description of two individuals involved in the shooting.  The victims were scared, nervous, upset, and concerned about their other friends when he interviewed them.

Cynthia Bieri testified that she lived in the apartment complex where the shooting occurred and that she heard several gunshots at 11:35 p.m. on July 17, 2004.  She looked out her window and saw a dark-colored sports utility vehicle with two occupants at the entrance to the complex.  The vehicle remained there for at least fifteen minutes and then left the complex.

Officer Kant testified that he spoke with four of the five victims at the hospital on the night of the shooting and acquired an explanation of what had happened, but no one identified the shooter.  According to Officer Kent, the victims also had no explanation for why someone would shoot at them.

4

### B.  The Verdict, Sentence, and Direct Appeal

On February 17, 2006, Petitioner's jury found him guilty, as charged, of conspiracy to commit first-degree (premeditated) murder, and on March 15, 2006, the trial court sentenced Petitioner to life imprisonment without the possibility of parole.  On appeal from his conviction, Petitioner argued that:  (1) the trial court incorrectly denied his motion for a directed verdict of acquittal; (2) the trial court abused its discretion by allowing the prosecutor to present "other acts" evidence; (3) he received ineffective assistance of counsel when his trial attorney failed to call witnesses in his behalf or contact any of the potential witnesses that he identified for counsel; and (4) the trial court committed plain error by sentencing him to life imprisonment without the possibility of parole.

The Michigan Court of Appeals affirmed Petitioner's  conviction, but remanded his case for correction of the judgment of sentence to reflect a sentence of life imprisonment with the possibility of parole.   *See id.*, 2008 WL 747099, at *1 and *5.  On July 29, 2008, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  *See People v. Zoica*, 482 Mich. 897; 753 N.W.2d 184 (2008) (table).

### C.  The Post-Conviction Motion and Collateral Appeal

On October 9, 2009, Petitioner filed a motion for relief from judgment in which he raised several issues about his trial attorney.  He also alleged that his appellate attorney was ineffective for failing to present all his claims on appeal and that the trial court deprived him of due process and equal protection of the law by failing to provide him

5

with a complete trial transcript.  The state trial court denied Petitioner's motion, and the Michigan Court of Appeals denied leave to appeal the trial court's decision because Petitioner failed to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Zoica*, No. 305338 (Mich. Ct. App. Dec. 19, 2011).  On October 22, 2012, the Michigan Supreme Court denied leave to appeal for the same reason.  *See People v. Zoica*, 493 Mich. 867; 821 N.W.2d 543 (2012) (table).

### D.  The Habeas Petition, Responsive Pleading, and Reply

On November 5, 2012, Petitioner filed his habeas corpus petition. His grounds for relief are:   (1) trial counsel's advice during plea negotiations was so incorrect and insufficient as to undermine his ability to make an intelligent decision on whether to accept the plea offer; (2) trial counsel's representation resulted in an actual conflict of interest that adversely affected the attorney's performance; (3) trial counsel was ineffective for failing  to investigate and present an alibi defense for the night before the shooting when Petitioner allegedly participated in the conspiracy; (4) trial counsel was ineffective for failing to impeach two prosecution witnesses with their bias toward him; (5) trial counsel's incorrect advice and threat not to make a closing argument if Petitioner testified rendered his waiver of the right to testify involuntary; and (6) appellate counsel was ineffective for failing to raise claims one through five on direct appeal.

Respondent urges the Court to deny the petition on the ground that the state courts' rejection of Petitioner's claims was objectively reasonable.  Petitioner replies that

the Court should not defer to the state courts' rulings because the state courts did not

adjudicate the merits of his claims.

## II. STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for

persons in state custody is provided by 28 U.S.C. § 2254, as amended by the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*,

562 U.S. 86, 97 (2011). Pursuant to § 2254, the court may not grant a state prisoner's

application for the writ of habeas corpus unless the state court's adjudication of the

prisoner's claims on the merits

> (1)   resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or

> (2)   resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented
> in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court
> may grant the writ if the state court arrives at a conclusion opposite to that
> reached by [the Supreme] Court on a question of law or if the state court
> decides a case differently than [the Supreme] Court has on a set of
> materially indistinguishable facts.  Under the "unreasonable application"
> clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the
> state court identifies the correct governing legal principle from [the
> Supreme] Court's decisions but unreasonably applies that principle to the
> facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for

Part II).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)."  *Renico v. Lett*, 559 U.S. 766, 773 (2010).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly,

> [w]hen reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).  This is especially true for claims of ineffective assistance of counsel, where AEDPA review must be " ' "doubly deferential" ' " in order to afford "both the state court and the defense attorney the benefit of the doubt."  *Burt v. Titlow*, 571 U.S. ——, –——, 134 S.Ct. 10, 13, 187 L.Ed.2d 348 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, ——, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011)).

*Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (*per curiam*).  To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his claims "was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement."  *Harrington*, 562 U.S. at 103.

III.  **ANALYSIS**

  **A. Trial Counsel**

Petitioner's first five claims allege ineffective assistance of trial counsel.  The Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668 (1984), is clearly established federal law for purposes of ineffective-assistance-of-counsel claims. *Pinholster*, 131 S. Ct. at 1403.  Under *Strickland*, a defendant must show that "counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."  *Id.*

The "deficient performance" prong of the *Strickland* test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*. at 687.  "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id*. at 689.

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

9

To demonstrate that counsel's performance prejudiced the defense, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' " but "[t]he likelihood of a different result must be substantial, not just conceivable."  *Harrington*, 562 U.S. at 111-12 (quoting *Strickland*, 466 U.S. at 693).

"The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Id.* at 105 (internal and end citations omitted).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Id.*

### 1. During Plea Negotiations

Petitioner claims that his trial attorney's advice during plea negotiations was incorrect and so insufficient as to undermine his ability to make an intelligent decision on whether to accept the plea offer.  According to Petitioner, the prosecutor offered him a plea bargain with a sentence of up to twenty years in prison in exchange for Petitioner's testimony against his co-defendants.   Petitioner claims that his trial counsel's performance was deficient because: (1) counsel did not explain the nature of the plea, the charge to which Petitioner would have to plead guilty, or whether the twenty-year sentence was the minimum or maximum sentence; (2) trial counsel was wrong in assuming that Petitioner would be placed in solitary confinement in prison to

protect him from his co-defendants if he testified against them; and (3) trial counsel failed to consult him about a second offer that the prosecutor made. Petitioner claims that he would have pleaded guilty if he had known the Michigan Department of Corrections would keep him separated from his co-defendants following his guilty plea and testimony against them.

Petitioner first raised his claim in his motion for relief from judgment. The state trial court rejected the claim because Petitioner did not establish the factual predicate for his claim by supporting his claim with an affidavit or other offer of proof.

### a. Clearly Established Federal Law

Defendants in criminal cases are entitled to effective assistance of counsel during plea negotiations. *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). *Strickland's* two-part test " 'applies to challenges to guilty pleas based on ineffective assistance of counsel.' " *Id.* (quoting *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)). As noted above, "[t]he performance prong of *Strickland* requires a defendant to show that counsel's representation fell below an objective standard of reasonableness." *Id.* (quotation marks and end citations omitted). In the context of pleas, the prejudice prong requires the defendant to show that "the outcome of the plea process would have been different with competent advice." *Id.* When the ineffective advice led to the rejection of a plea offer,

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been

11

less severe than under the judgment and sentence that in fact were imposed.

*Id.* at 1385.

### b. Application

Following jury selection in Petitioner's case, his attorney informed the trial court that the prosecuting attorney had approached him that morning and asked him to speak with Petitioner about the possibility of Petitioner pleading guilty to a lesser charge in exchange for his truthful testimony. Petitioner then acknowledged on the record that his attorney had explained to him what the prosecutor had said and that, if the prosecutor did make an offer, he (Petitioner) would be expected to spend at least twenty years in prison. Petitioner further acknowledged on the record that he had told his attorney he was not interested in the offer. Petitioner also said that his attorney did not threaten him or force him to reject the offer and that he had made an independent decision after his attorney provided him with information from the prosecutor. (Trial Tr. Jan. 24, 2006, at 181-83.)

The prosecutor then explained to the trial court that he had merely engaged in discussions with Petitioner's attorney and that, if Petitioner were to agree to a sentence of twenty or more years, he (the prosecutor) would have to explore the matter with his office. He did not think that this office would accept anything less than twenty years in prison because he was confident about the case. The prosecutor concluded his remarks by stating that, if Petitioner changed his mind and wanted to re-negotiate, he would have to act very quickly. (*Id.* at 183-84.) Petitioner did not respond, and the case proceeded to trial. Nothing more was said about the plea offer. Petitioner now seeks

an opportunity to plead guilty and to be sentenced to a maximum sentence of twenty years in prison.

Petitioner misconstrues the prosecutor's comments.  There was no firm offer, and both the prosecutor and defense counsel indicated on the record that any plea agreement would entail a sentence of *at least* twenty years, not a term of years *up to* twenty years.  The record, moreover, indicates that Petitioner was not interested in pleading guilty in exchange for a sentence of twenty years, and the prosecutor predicted that his office would not approve a sentence of less than twenty years.  Petitioner has failed to show that the prosecutor would have presented a plea offer involving a maximum sentence of twenty years.

Furthermore, there is no evidence in the record that the prosecutor made a second  offer, which defense counsel failed to communicate to Petitioner.  *Cf. Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012) (holding that, "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused" and "[w]hen defense counsel allow[s] the offer to expire without advising the defendant or allowing him to consider it, defense counsel [does] not render the effective assistance the Constitution requires").  The Court cannot consider Petitioner's self-serving affidavit to the contrary, because the affidavit obviously was not presented to the state courts; it was signed on October 31, 2012, which was after the state courts concluded their review of Petitioner's claims.  *See Pinholster*, 131 S. Ct. at 1398 (holding "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the

13

merits"); *see also Howard v. Holloway*, No. 1:14cv756, 2015 WL 364432, at *6 (E.D. Va. Jan. 26, 2015) (unpublished decision stating that "a petitioner generally cannot rely on his own self-serving affidavit to establish his entitlement to relief" and that the petitioner's affidavit could not be considered on habeas review because it was not part of the record before the state courts); *Sula v. Stephens*, No. H-13-1225, 2014 WL 297571, at *12 n.12 (S.D. Tex. Jan. 27, 2014) (unpublished decision citing *Pinholster* and stating that "[t]his Court cannot consider petitioner's affidavits and exhibits that were not submitted to the state court on collateral review").

There also is no evidence in the record, apart from Petitioner's affidavit, that defense counsel advised Petitioner not to plead guilty because he would be placed in protective solitary confinement if he testified against his co-defendants. Even if defense counsel made the comment and was incorrect in giving that advice, Petitioner stated on the record that his attorney did not threaten him or force him to reject a plea offer. He also stated that he had made an independent decision not to accept an offer of at least twenty years in prison.

Petitioner has failed to show that, but for his attorney's allegedly ineffective assistance, a reasonable probability exists that (1) the prosecutor would have offered him a sentence of no more than twenty years in exchange for his guilty plea and testimony against his co-defendants and (2) he would testified against his friends and accepted an offer of twenty years in prison. The Court therefore denies relief on Petitioner's claim that his attorney provided ineffective assistance during plea negotiations.

14

## 2.  Alleged Conflict of Interest

Petitioner alleges next that his trial attorney had a conflict of interest that adversely affected his performance.   Petitioner contends that his attorney was controlled by the co-defendants' attorneys, adopted his co-defendants' defense at his expense, and was more concerned with his co-defendants' case than with his case.

Petitioner first raised a conflict-of-interest issue before jury selection, but the grounds for his claim were that his attorney failed to subpoena witnesses, failed to discuss the details of the case with him, and suggested that he refrain from testifying. (Trial Tr. Jan. 24, 2006, at 7-9.)  Petitioner raised the issue again during trial.  But the alleged conflict was his attorney's failure to ask the witnesses certain questions and the attorney's failure to visit him and discuss the case with him.  (Trial Tr. Feb. 6, 2006, at 3-6.)  The issue arose a third time at Petitioner's sentencing, but the trial court failed to see a conflict of interest in Petitioner's complaint about counsel, because Petitioner was merely arguing that the other defense attorneys had told Petitioner's attorney what to do.  The trial court pointed out that, in a joint trial, attorneys always discuss what should and should not be brought out.  (Sentencing Tr.,  Mar. 15, 2006, at 44-45.)

Petitioner subsequently raised the issue in his motion for relief from judgment. The state trial court denied relief on the mistaken basis that Petitioner had raised his claim on direct appeal.  The court determined that it was precluded from granting relief because the Michigan Court of Appeals had already decided the issue.  In reaching this conclusion, the trial court cited Michigan Court Rule 6.508(D)(2), which is "a collateral estoppel rule [that] prohibits a trial court from reconsidering a claim already decided

against a defendant on direct appeal. The application of such a rule typically does not bar federal habeas review." *Skinner v. McLemore*, 425 F. App'x 491, 495 (6th Cir. 2011) (citing *Hicks v. Straub*, 377 F.3d 538, 558 n. 17 (6th Cir. 2004), and *Bell v. Cone*, 556 U.S. 449, __, 129 S. Ct. 1769, 1781 (2009)).

The Michigan Court of Appeals and Michigan Supreme Court cited Rule 6.508(D) in their orders denying leave to appeal the trial court's decision on Petitioner's motion for relief from judgment. Because all three state courts issued decisions grounded in procedural principles, namely, Rule 6.508(D), and did not adjudicate Petitioner's claim on the merits, AEDPA's deferential standard of review of the state courts' decisions does not apply. *Barton v. Warden, Southern Ohio Corr. Facility,* 786 F.3d 450, 460-61 (6th Cir. 2015). The Court therefore reviews Petitioner's claim *de novo. Id.* at 464.

### a. Legal Framework

The Supreme Court stated in *Strickland* that a defense attorney "owes the client a duty of loyalty, a duty to avoid conflicts of interest." *Strickland*, 466 U.S. at 688. But "the possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler v. Sullivan*, 466 U.S. 335, 350 (1980). To establish a violation of the Sixth Amendment right to conflict-free counsel, "a defendant must show both that his counsel (1) had 'an actual conflict of interest,' and (2) acted adverse to his client's interests because of the conflict." *United States v. Hunter*, 558 F.3d 495, 506 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 692). "[P]rejudice is presumed when counsel is burdened by an actual conflict of interest" because "[i]n those circumstances, counsel breaches the duty of

16

loyalty, perhaps the most basic of counsel's duties." *Strickland,* 466 U.S. at 692 (citing *Sullivan,* 466 U.S. at 345-50).

### b.  Application

Petitioner has failed to demonstrate that his attorney was burdened by an actual conflict of interest.  The attorney did not jointly represent Petitioner and either one of the other defendants,[1] and even though Petitioner contends that his attorney adopted the co-defendants' theory of self-defense, the record belies this contention.   In cross-examining witnesses, Petitioner's attorney attempted to show that the most incriminating witnesses against Petitioner had lied in the past and were motivated to testify against the defendants because the witnesses had received favorable plea agreements.   Defense counsel also brought the fact that the victims did not see Petitioner during the shooting and that Petitioner initially was not listed as a suspect by a police informant named Arjan Malushi.  And, in his closing argument, defense counsel maintained that some prosecution witnesses were not credible because they were accomplices and admitted liars or biased against Petitioner.  Counsel also argued that Petitioner did not participate in the conspiracy and that, even if Petitioner were merely present when discussions about the shooting occurred, he did not intend to kill anybody. Counsel maintained that, if there was a conspiracy, it was between Manoku and Merko. (Trial Tr. Feb. 17, 2006, A.M. session, at 33-61.)  Clearly, counsel did not adopt the co-defendants' defense, nor show more concern for the co-defendants than for Petitioner.

---

[1]  Each of the three defendants had his own attorney.

17

Although the defense attorneys did cooperate with one another at trial, defendants can benefit from the joint efforts of lawyers who assist one another in their preparation.  *Burger v. Kemp*, 483 U.S. 776, 783-84 (1987).  Presenting a united front "is not evidence of a conflict of interest but rather a sound legal strategy:  '[a] common defense often gives strength against a common attack.' "  *Ramirez v. Dretke*, 396 F.3d 646, 649 (5th Cir. 2005) (quoting *United States v. Benavidez*, 664 F.2d 1255, 1260 (5th Cir. 1982) (quoting *Holloway v. Arkansas*, 435 U.S. 475, 482–83(1978) (quoting *Glasser v. United States*, 315 U.S. 60, 92 (1942) (Frankfurter, J., dissenting)).

Petitioner's attorney did not "actively represent[] conflicting interests," and there was "no actual conflict of interest adversely affect[ing] his attorney's  performance." *Strickland*, 466 U.S. at 692 (quoting *Sullivan*, 446 U.S. at 350, 348).   The Court therefore declines to grant relief on Petitioner's conflict-of-interest claim.

### 3.  Failure to Raise an Alibi Defense

Petitioner alleges that his trial attorney was ineffective because the attorney failed to investigate and present an alibi defense for July 16, 2004, the night before the shooting.  This claim arises from testimony that, on the night of July 16, 2004, Petitioner and his co-defendants were watching a coffee shop, which the victims were renovating prior to its opening.  According to Erjon Barci (Barci), when Ilirjan Dibra (Dibra) left the coffee shop, Petitioner, Barci, and another friend followed Dibra as he drove away. Petitioner had a gun in the car and was communicating by phone with Manoku as he, Barci, and the third friend chased Dibra.  Although Manoku ordered Petitioner by phone

18

to shoot Dibra, Petitioner and his friends lost track of Dibra, and no shooting occurred. (Trial Tr. Feb. 76, 2006, at 16-28.)

Petitioner contends that he could have impeached Barci's trial testimony by presenting two witnesses who would have testified that Petitioner was present with them on the night of July 16, 2004. Petitioner claims that he informed his trial attorney about the alibi witnesses, but his attorney did not investigate the matter, nor attempt to locate his alibi witnesses.

### a. Clearly Established Federal Law

Defense attorneys have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691 (emphasis added). This duty includes the obligation "to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "[T]he failure to call a known alibi witness generally would constitute ineffective assistance of counsel." *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004). But "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

### b. Application

Petitioner complained to the trial court before jury selection that his attorney had failed to subpoena witnesses. His attorney responded that Petitioner had not given him the witnesses' addresses or telephone numbers. The attorney also pointed out that the conspiracy allegedly occurred over a couple of days and that the witnesses suggested

19

by Petitioner were not present at the scene of the homicide. The attorney thought that he could effectively cross-examine the witnesses who had testified against Petitioner at the preliminary examination and that anyone else would know nothing about the shooting, other than what Petitioner had told them. The trial court was satisfied that Petitioner was properly represented and that the trial should proceed. (Trial Tr. Jan. 24, 2006, at 7-10.)

Petitioner raised the issue again at his sentencing, but his attorney pointed out that the conspiracy occurred before Friday, July 16, 2004, the date for which Petitioner had an alibi. (Sentencing Tr., Mar. 15, 2006, pp. 36-37, 42.) Petitioner also raised his claim on direct appeal. The Michigan Court of Appeals denied relief on the ground that "[a]ny lack of evidence in support of a defense to the charge cannot be attributed to any failure to defendant's counsel." *Zoica*, 2008 WL 747099, at *5. The Court of Appeals also stated that decisions on the choice of witnesses is a matter of trial strategy and that it would not substitute its judgment for that of counsel on such matters.

This Court agrees with the Michigan Court of Appeals that Petitioner has failed to overcome the strong presumption that he received the effective assistance of counsel. Defense counsel's failure to call alibi witnesses for Friday, July 16, 2004, did not amount to deficient performance for two reasons. First, the record indicates that Petitioner did not provide enough specific information for his attorney to locate the witnesses.

Second, the prosecutor's theory was that the conspiracy occurred over a period of three days. The prosecutor maintained that the conspiracy was complete on Thursday, July 15, 2004, when Petitioner and his co-defendants looked for Markiol Jaku

and Martin Vucaj and agreed to shoot the victims.   The prosecutor argued that Petitioner's acts and comments on Saturday, July 17, 2004, were further evidence of Petitioner's participation in the conspiracy.   In light of evidence that Petitioner participated in a conspiracy to shoot the victims on July 15, 2004, and on July 17, 2004, defense counsel was not ineffective for failing to investigate and pursue an alibi for July 16, 2004.

### 4.  Failure to Impeach Key Prosecution Witnesses

In his fourth claim, Petitioner alleges that his attorney failed to impeach Barci and Florjon Carcani (Carcani) who implicated him in the conspiracy.   Petitioner contends that his attorney should have questioned Barci and Carcani about their bias towards him and the fact that they implicated him in the conspiracy after being informed that he had already cooperated with the police and disclosed Barci and Carcani's participation in the crime.   The Court reviews this claim *de novo* because no state court adjudicated the claim on the merits.

A trial attorney's failure to use readily available evidence to impeach the credibility of the only witnesses tying the defendant to the crime is well outside the range of professionally competent assistance and undermines the result of the trial. *Peoples v. Lafler*, 734 F.3d 503, 514 (6th Cir. 2013). Here, however, Barci and Carcani were thoroughly questioned about their motives for testifying against the defendants.

All three defense attorneys cross-examined Carcani over the course of three days.   The cross examination and re-cross examination of Carcani by Petitioner's attorney alone covers about sixty-six pages of transcript.   (Trial Tr. Feb. 3, 2006,

afternoon session, at 59-106, 164-66; Trial Tr., Feb. 6, 2006, at 30-35,  53-60, and 62-67.)   Counsel for Petitioner asked Carcani at length about his favorable plea agreements on state and federal charges and the fact that he initially lied to the police and the FBI.  (Trial Tr. Feb. 3, 2006, at 79-95.) Counsel also elicited Carcani's testimony that he was more upset with Petitioner than with other members of his group.  (*Id.* at 164-65; Trial Tr. Feb. 6, 2006, at 33.)

All three defense attorneys also cross-examined and re-cross-examined Erjon Barci.  Counsel for Petitioner questioned Barci about his prior convictions for crimes of theft or dishonesty and about his initial failure to tell the truth when questioned by state and federal officials.  Petitioner's attorney further questioned Barci about the fact that he had not yet been sentenced in federal court for lying to a federal agent and that there was an outstanding deportation order for him.  (Trial  Tr.  Feb. 7, 2006, at 121-24, 157.)  And there is no clear evidence that either Carcani or Barci testified against Petitioner because he first implicated them in the crime.  FBI agent Joseph Callahan testified that Carcani was not informed what other witnesses had said about the case (Trial Tr. Feb. 14, 2006, at 8), and even though Barci was told that other people were cooperating, he was not permitted to read the reports made by other people (*id.* at 14-15).

The Court concludes that defense counsel's cross-examination of Barci and Carcani was adequate and did not amount to deficient performance.   Petitioner therefore has no right to relief on the basis of his claim about trial counsel's cross-examination of Barci and Carcani.

### 5.   Advice on the Right to Testify

Petitioner alleges that his trial attorney gave him bad advice about whether to testify and, therefore, his decision not to testify was involuntary.  According to Petitioner, his attorney incorrectly informed him that he would be impeached with other pending charges if he testified.  Petitioner further alleges that his attorney threatened not to give a closing argument if Petitioner did testify.  The Court reviews this claim *de novo* because no state court adjudicated the claim on the merits.

"[A] defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense."  *Rock v. Arkansas*, 483 U.S. 44, 49 (1987).  This right "is personal to the defendant, may be relinquished only by the defendant, and the defendant's relinquishment of the right must be knowing and intentional."  *United States v. Webber*,  208 F.3d 545, 550-51 (6th Cir. 2000) (citing *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)).  But "when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed."  *Id.* at 551 (citing *Joelson*, 7 F.3d at 177).

Petitioner informed the trial court immediately before jury selection that he was unhappy with his attorney.  Among other things, he mentioned that, five days earlier, his attorney had told him not to take the stand because his co-defendant's relatives would come after him.  Petitioner asked for the trial court's help, but he did not insist on testifying or say that he was being coerced into waiving his right to testify.  (Trial Tr., Jan. 24, 2006, at 8.)

23

Three weeks later, at the close of the prosecutor's case, Petitioner unequivocally waived his right to testify.  He stated on the record that nobody had threatened him or promised him anything not to testify and that he was waiving his right to testify freely and voluntarily.  He also stated that he made his decision independently after consulting with his attorney.  (Trial Tr. Feb. 14, 2006, pp. 81-83.)

Although Petitioner claims that his waiver of the right to testify was involuntary due to his attorney's incorrect advice and threat to forgo a closing argument if Petitioner testified,

> [a] defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel.  *Joelson*, 7 F.3d at 177.  At base, a defendant must "alert the trial court" that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand.  *Pelzer [ v. United States]*, 1997 WL 12125 at *2 [6th Cir. 1997]].  When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct.  Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so.  *Joelson*, 7 F.3d at 177.

*Webber,* 208 F.3d at 551.

Petitioner was given an opportunity to address the trial court at the close of the prosecution's case, but he did not insist on testifying.  Instead, he stated that he was freely and voluntarily waiving his right to testify.

Defense attorneys are "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  And the advice not to testify in this case apparently was tactical because Petitioner alleges that his attorney was concerned about him being impeached with other charges.  *See Warlick v. Romanowski*, 367 F. App'x 634, 642 (6th

Cir. 2010) (noting that the decision not to testify was tactical because the petitioner's attorney was concerned about impeachment with a prior conviction).  Because a tactical decision was made not to have Petitioner testify, his assent is presumed.  *Webber*, 208 F.3d at 551.  Petitioner's "present allegations that he wanted to testify and was prevented from doing so do not suffice to overcome the presumption that he assented to the tactical decision that he not testify."  *Hodge v. Haeberlin*, 579 F.3d 627, 639 (6th Cir. 2009).

Even if defense counsel's performance was deficient, Petitioner was not prejudiced by the advice not to testify.  Although he claims that he would have testified that he did not participate in the conspiratorial conversations, that he did not participate in the chase of a victim on July 16, 2004, and that he provided a false alibi for the shooting because his co-defendants had threatened him and his sister, there was substantial evidence that he was involved in the conspiracy to shoot and kill one or more people.  Petitioner has failed to show that his attorney's allegedly deficient performance prejudiced the defense.  He has no right to relief on the basis that his waiver of the right to testify was involuntary due to counsel's advice and alleged threat not to give a closing argument.

### B.  Appellate Counsel

Petitioner's sixth and final claim alleges that appellate counsel was ineffective for failing to raise all of Petitioner's other claims on direct appeal.  Petitioner also alleges that appellate counsel neglected to inform him of his right to file a supplemental *pro se* brief in support of the claims not raised by appellate counsel.

25

Petitioner raised this claim in his motion for relief from judgment.  The state trial court rejected the claim because, in its opinion, the Michigan Court of Appeals fully addressed all of Petitioner's claims about counsel on direct appeal and because counsel was not required to advocate a meritless position.

An appellate attorney's failure "to raise an issue on appeal can amount to constitutionally ineffective assistance."  *Jalowiec v. Bradshaw*, 657 F.3d 293, 321 (6th Cir. 2011).  But an appellate attorney is not required to raise every non-frivolous claim requested by his or her client if counsel decides not to raise the claim as a matter of professional judgment.  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  "In fact, the process of ' "winnowing out weaker arguments on appeal" ' is the 'hallmark of effective appellate advocacy.' "  *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) (quoting *Smith v. Murray,* 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751-52)).  To demonstrate that appellate counsel was ineffective, a habeas petitioner must show (1) that his attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal and (2)  a reasonable probability exists that he would have prevailed on appeal if his appellate attorney had raised the issues.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland*, 466 U.S. at 687-91, 694).

Appellate counsel did raise one of Petitioner's claims on appeal, and he did not act unreasonably in failing to raise the other claims, because those claims lack merit.  Furthermore, there is not a substantial probability that Petitioner would have prevailed on appeal if his attorney had raised all his claims or had informed Petitioner how to file a *pro se* supplemental brief.  The Court therefore concludes that Petitioner's appellate

26

attorney was not constitutionally ineffective.  An appellate attorney is not ineffective for failing to raise an issue that lacks merit.  *Shaneburger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)).

## IV.  CONCLUSION

To the extent that the state courts adjudicated Petitioner's claims on the merits, their decisions were not contrary to Supreme Court precedent, unreasonable applications of Supreme Court precedent, or unreasonable applications of the facts.  As to the other claims, Petitioner's constitutional rights were not violated, and the state courts' rejection of the claims was not "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement."  *Harrington*, 562 U.S. at 103. Accordingly, the petition for writ of habeas corpus is denied.

## V.  CERTIFICATE OF APPEALABILITY AND APPELLATE FILING FEE

Before Petitioner may appeal this Court's decision, a certificate of appealability must issue.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Reasonable jurists would not disagree with the Court's resolution of Petitioner's claims, nor conclude that the issues deserve encouragement to proceed further.  The

Court therefore declines to issue a certificate of appealability.  But because an appeal could be taken in good faith, Petitioner may proceed *in forma pauperis* on appeal if he appeals this decision.  28 U.S.C. § 1915(a)(3).

s/Denise Page Hood
Denise Page Hood
United States District Judge

Dated:  July 31, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 31, 2015, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager